IN THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :
                                  :
              v.                  : Criminal No. 17-141
                                  :
ROBERT ALLEN                      :


**<u>MEMORANDUM IN SUPPORT OF DEFENDANT'S PRETRIAL MOTIONS</u>**


PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832
PAUL JUBAS LAW, P.C.
P.O. Box 10704
Pittsburgh, PA 15203
(412) 230-0023
pjubasesq@gmail.com

*Counsel for Defendant*

Dated: December 06, 2022


1

## INTRODUCTION

In April and May 2017, Agents executed a surveillance operation and attempted three controlled buys in response to a fatal heroin overdose. Their first controlled buy succeeded, which allowed agents to flip an informant for use in two subsequent controlled buy operations that targeted Defendant. These subsequent, attempted controlled buys were failures. During the April 26 attempted controlled buy, agents failed to maintain surveillance of their informant at critical stages of the operation. The informant also proved himself to be unreliable when he, *inter alia*,: received transportation to and from the purported controlled buy from a compromised vehicle, driven by a compromised individual, both of which agents failed to search and secure; turned his recorder off while in the compromised vehicle, after the purported transaction with Defendant; the informant had the compromised vehicle drop him off at home after he turned his recorder off; and finally, the informant met with agents to give them the "drugs" more than an hour after turning the recorder off.

Despite these failures in surveillance and the demonstrated lack of reliability of the informant, agents applied for a search warrant on May 2, 2017 for Defendant's cell phone GPS location data. Agents did not inform the Magistrate Judge of the devastating lapses in their informant's reliability, or that they lost surveillance of him at numerous critical stages of the operation. Instead, agents blurred the lines of the successful initial controlled buy with their informant, with those of the compromised April 26 attempted controlled buy with Defendant. The Magistrate Judge signed the warrant for defendant's GPS data on May 5, 2017.

On May 10, agents attempted another controlled buy. This time, agents' plans were dashed when one of their own surveillance members was "made" by an individual in the apartment complex under surveillance. Even though agents did not know the location of the

suspected stash house, agents accelerated their plans to execute search warrants to save the investigation.

After surveilling Defendant to their now-suspected target location, Defendant contacted the informant and told him that Defendant was ready to meet. Agents used this opportunity to arrest Defendant in a black SUV after he left the suspected target location. Although agent's believed Defendant was on his way to sell 100 grams of fentanyl to their informant, Defendant was arrested with no drugs on his person or in the vehicle he was driving.

Desperate to get access to Apartment 3B (the suspected stash house) agents attempted to get Defendant to give them consent to enter the apartment. Defendant refused to cooperate, which forced agents to apply for a search warrant. In the affidavit of probable cause for Apartment 3B, agents essentially copied and pasted the previous misleading affidavit of probable cause from the May 5 warrant, but added new, completely fabricated pieces of evidence by claiming that agents had evidence of Defendant entering and exiting Apartment 3B during the April 26 operation. Agents added this language even though they did not learn about Apartment 3B until May 10. The Magistrate Judge signed the warrant.

Agents then executed the warrant at Aparment 3B, and quickly realized that 3B was not a stash house. After purportedly talking to the resident of 3B, who pointed agents in the direction of Apartment 3A, agents breached 3A without a warrant, found the stash house and someone flushing drugs down the toilet. This individual claimed the drugs belonged to Defendant. Agents also searched the residence Defendant had stayed for the past four nights, where they found a large amount of cash and a firearm. Defendant was subsequently indicted on drug conspiracy and firearms charges. No one else was charged, including the informant and the individual that was flushing drugs in Apt. 3A.

3

Instead of fulfilling its duty of candor to this Court by informing the Court of the true nature of the April 26 attempted controlled buy (which formed the probable cause for the warrants used to collect all evidence in this case) the United States Attorney's Office initiated a campaign of deception to effectively coverup the critical problems associated with the April 26 botched controlled buy.

From the outset, AUSA Timothy Lanni misrepresented to this Court that probable cause existed for the warrants because agents completely corroborated the April 26 "controlled buy," and as such, the informant's credibility is not at issue. He also misrepresented to this Court that there were two controlled buys involving Defendant. Since AUSA Lanni's resignation from the Western District of Pennsylvania, substitute AUSAs have undertaken a deceptive, piecemeal approach to "correcting" AUSA Lanni's misrepresentations.

First, on March 31, 2022, the United States Attorney's Office admitted that no controlled buy occurred on May 10. Next, on May 24, 2022, they disclosed a 302 that proves the unreliability of the informant on April 26. It is notable, however, the Government only disclosed this exculpatory evidence after Defendant proved the unreliability of the informant in pretrial motions. Finally, with weeks to go before trial, and in direct contradiction of its representations to this Court at the Final Pretrial Conference, the Government dropped the April 26 "controlled buy" charge and has since attempted to prevent any inquiry into its compromised informant.

The Government's attempt to coverup their informant is two-fold: first, the informant compromised their probable cause in this case, and litigation of the facts and circumstances surrounding the informant will expose the farce that is the Government's probable cause in this case. Secondly, the informant has since been charged with homicide. Not only is the Government

trying to save its case against Defendant by hiding the informant, but it also seeks to prevent an informant scandal from erupting since their informant has since been implicated in murder.

## FACTUAL BACKGROUND

In April 2017, agents initiated an investigation into a fatal heroin overdose. Agents successfully conducted a controlled buy that resulted in confiscation of suspected controlled substances. Forensic testing returned positive results for fentanyl. Agents then flipped the individual involved in the controlled buy for use as a confidential informant. *See* 3/31/22 NT at 9-10, attached hereto as Exhibit D-1.

The informant told agents that Defendant was a kilogram level fentanyl supplier; that Defendant supplied bulk and individual amounts; that he had Defendant's phone number; and that informant could use that phone number to arrange a meeting to purchase fentanyl from Defendant. Based on this information, agents initiated a controlled buy operation on April 26, 2017. *Id*. at 10.

**April 26, 2017 Botched Controlled Buy Operation**

On April 26, 2017, while in the presence of agents, CS1 conducted a consensually recorded telephone call with Defendant at 10:40 am on the telephone number previously provided, to set up a purported purchase of fentanyl. *See* 4/26/17 302 - Compromised Informant at 1, attached hereto as Exhibit D-2). Although the recording is not of great quality, it is crystal clear that, in a 302 describing the call, agents flipped the roles so as to attribute Defendant's comments to their informant, and vice versa.

**Informant Compromises April 26 Controlled Buy Operation**

Informant was then fitted with a transmitter, an audio recorder, given official funds, and returned to his residence, purportedly under surveillance. Informant was then picked up from his

residence by an unsearched and unsecured Subaru, driven by an unknown, unsearched and unsecured individual. Informant did not turn the audio recorder on until *after* he entered the compromised Subaru.[1] Informant was then driven by the compromised Subaru to the meet location near Bryn Mawr Road. *See* 4/26/17 Controlled Buy 302, attached hereto as Exhibit D-2.

Meanwhile, at approx. 10:44 am, surveillance observed Defendant walking down a stairwell from the area of Burton Way/Clarissa St. towards Bryn Mawr Rd., where he turned right, blocking the view of one group of surveillance agents. Additional purported surveillance units positioned at a "different" vantage point reported Defendant's black Infinity SUV parked out of their *view* in the direction Defendant was last seen heading. *See* 4/26/17 Surveillance 302 at 2, attached hereto as Exhibit D-3. At approx. 10:47 am, after agents lost sight of Defendant for approx. 2 minutes, the initial surveillance unit observed Defendant driving the black Infinity SUV along Anaheim St., past Lyon St and out of view. *Id*.

At approx. 10:51 am, the black Infinity was surveilled traveling along Lyon St. and turning right onto Anaheim St. A minute later, the black Infinity SUV is purportedly surveilled traveling along Lyon St., then turned left onto Anaheim. *Id*.

Upon arrival at the meet location at approx. 10:52am (*see* 4/26 audio recording, at 7:00), informant exited the compromised vehicle and entered the black Infinity SUV (*Id*. at 8:07-9:40). Surveillance teams did not observe the informant exit the compromised vehicle, nor did they observe him enter the black Infinity SUV with Defendant, nor did they obtain any video of the same. *See* 4/26/17 302 – Compromised Informant, attached hereto as Exhibit D-2.

---

[1] The beginning of the recording is plagued by what sounds like brief loops of background music. Given the unnatural sounds at the beginning of the recording, as well as the demonstrated willingness of agents to deceive the Courts in this case, the integrity of this recording must be questioned.

Shortly after getting into the black Infinity SUV, the informant can be heard possibly showing Defendant the government marked bills, whereupon the following vague exchange occurred (*Id*. at 9:45):

> Defendant: What's that right there?
>
> Informant: …That's what I owe you...
>
> …
>
> Informant: (recounts story of being robbed)…Maybe if I give him his paper back, maybe he'll look out again.
>
> Defendant: That's ummm…
>
> Informant replied: That's what I owed you.

*Id*. at 10:50.

Shortly thereafter, informant exited the black Infinity SUV (*Id*. at 13:00) and reentered the compromised vehicle (*Id*. at 13:40). Agents failed to observe or obtain video of informant exiting the black SUV and reentering the compromised Subaru. The informant next told the unknown driver to take him home (*Id*. at 14:17). At approx. 11:00 am, while still in the compromised Subaru, informant turned his audio recorder off (*Id*. at 16:01). Informant was then, apparently, dropped off at his residence. he subsequently contacted SA Piccinni[2], then, more than an hour later, met with TFO Mordaunt and SA Balish to turn over what the informant alleged[3] to be 100 grams fentanyl. *See* 4/26/17 302 – Compromised Informant, attached hereto as Exhibit D-2.

**May 5, 2017 Search Warrant – Defendant's Cell Phone GPS Location Data**

---

[2] It is unclear how, where, and when the informant contacted SA Picinni, as discussed further in the Discovery portion of this Memorandum, *infra*.

[3] Defendant is not in possession of any evidence indicating that the "alleged fentanyl" purportedly recovered by agents from their informant on April 26 was ever sent to a crime lab for testing, as discussed in the Discovery portion of this Memorandum, *infra*.

On May 2, 2017, based on the earlier controlled buy that led to flipping the informant; information about Defendant provided by informant; and the attempted, botched controlled buy on April 26, SA Piccini authored a search warrant for Defendant's cell phone GPS data. *See* 5/2/17 Affidavit attached hereto as Exhibit D-4. Paragraphs, 14-18, make up the entirety of the probable cause portion of the May 2 affidavit. *Id*. at 6-7.

The probable cause portion of SA Picinni's affidavit began by citing the "belief[] and fear" that agents had of Defendant learning the identity of the informant. "Being identified", stated Barrett, "could subject a Confidential Human Source to bodily injury or death."[4] *Id.* at 6.

Paragraph 14 references controlled narcotics purchases and buy/bust operations. The controlled buy operation that lead agents to the informant is the only controlled buy/bust operation successfully undertaken by agents. *Id*. at 6.

Paragraph 15 accurately stated that the drugs that tested positive for fentanyl came from the initial controlled buy with informant (previous to April 26). *Id*. at 6.

Paragraph 16 is free of misrepresentations. *Id*. at 6-7.

A single omission taints an otherwise truthful paragraph 17. In the third sentence of paragraph 17, SA Picinni omitted that, after the informant was provided with the recording device, he was transported back to his house, where he was picked up by an unknown, unsearched and unsecured individual driving an unsearched, unsecured vehicle. *Id*. at 7. *See also*, Exhibit D-2, detailing the general lack of surveillance, corroboration, and reliability throughout the April 26 operation.

---

[4] Despite agents' numerous overtures regarding their concern for the safety of the informant and the risk of Defendant learning his identity, the same agents made virtually zero effort at concealing their informant's identity in surveillance videos when discovery was turned over, effectively disclosing the identity of the informant to Defendant.

At paragraph 18, SA Picinni misrepresented the timeline of their attempted controlled buy, and omitted more facts regarding the unknown driver's compromising influence on the operation. SA Picinni stated that "upon completion of the transaction," the informant met with agents to turn over the recorder and purported drugs. This was an omission of the numerous instances of unreliable conduct exhibited by the informant throughout the porous April 26 operation. Notably, SA Picinni's May 2, 2017 warrant made no mention whatsoever of the informant's reliability. *Id*. at 6-7.

On May 5, 2017, based on SA Picinni's affidavit, Magistrate Judge Cynthia Reed Eddy granted the search warrant for Defendant's cell phone GPS data. *See* 5/5/17 Signed Warrant, attached hereto as Exhibit D-5.

**May 10, 2017 Failed Controlled Buy Operation**

On May 10, 2017, investigators initiated their surveillance operation around 1433 Crafton Blvd., the residence that Defendant had spent his last four nights, and 771 Bryn Mawr Rd., an apartment complex near the April 26th meet location of the informant and Defendant. *See* 5/10/17 Surveillance 302, Exhibit D-6. To this point, agents did not yet know the whereabouts of the target stash house, so they had no intentions of serving a search warrant for such a location. *See* 6/26/19 NT at p. 42 line 23 – p. 44, line 3, attached hereto as Exhibit D-7.

Agents set their informant up to attempt a controlled buy, providing him with $10,000 in government funds, which can buy approx. 100 grams of fentanyl. *Id.* at 34.

Although Agents didn't yet have a suspected stash house, their plans on executing search warrants were dramatically accelerated when a surveillance agent was spotted and approached by a civilian, who then walked into an apartment complex. *Id*.

At 2:42 pm, Defendant left the Crafton Blvd residence in a black Infiniti SUV, then drove to 771 Bryn Mawr Rd, and enters Apt. 3B. *See* 5/10/17 Surveillance 302, attached hereto as Exhibit D-6. At 3:06 pm, agents sent two Pittsburgh Police detectives into the 771 Bryn Mawr apartment complex, with the hopes of observing Defendant enter the suspected stash house. *Id*. at 3.

At 3:26 pm, Defendant arrived at 771 Bryn Mawr Rd., exited his Black SUV, and entered the apartment complex. *Id*. The detectives, who had no recording devices, observed Defendant enter Apartment 3B, purportedly with a white bag in his hands. *Id*. At 7:22 pm, Defendant contacted the informant and advised that he was ready to meet. *See* 5/10/17 CHS Document at 2, Exhibit D-8.  Defendant exited the apartment complex, got back into the black SUV, and drove away. *See* 5/10/17 Surveillance 302 at 4, Exhibit D-6.

**Defendant Arrested While Driving To Suspected Controlled Buy**

Pittsburgh Police Narcotics Units pulled Defendant over for driving without a license while he was driving in the Lawrenceville section of Pittsburgh. *See* 5/10/17 Defendant Arrest 302, attached hereto as Exhibit D-9. He was detained and transported to Carnegie Robotics at approx. 7:25pm, and read his Miranda around 7:32pm. *Id*. Despite agents' suspicion that Defendant was on his way to sell 100 grams of fentanyl to their informant, no drugs were found on either his person or in his black SUV.

SA Picinni unsuccessfully attempted to convince Defendant to cooperate with their investigation because they didn't want to have to get search warrants. *See* 6/26/19 NT at 42-43, attached hereto as Exhibit D-7. With no other options, agents applied for and obtained a search warrant at 7:35 pm for Apt. 3B, the Crafton Blvd. residence, and the black Infinity SUV. *See* 5/10/17 Apt 3B Search Warrant, attached hereto as Exhibit D-10.

**May 10, 2017 Search Warrant – Apartment 3B, Black Infinity SUV, 1433 Crafton Blvd.**

The probable cause portion of SA Barrett's affidavit was reproduced verbatim from SA Picinni's May 2, 2017 affidavit of probable cause, once again stressing that vague terms, locations, drug weights, etc., were being used because of the agents' primary concern that serious bodily injury or death could result if Defendant learned the identity of their informant.[5]

Paragraph 11 mimics paragraph 14 from the May 2 affidavit, once again highlighting agents' success with the initial controlled buy that led to their informant, while at the same time obfuscating and omitting the failures of their subsequent attempted controlled buy with Defendant.[6] Paragraph 12 is a verbatim reproduction of paragraph 16 from the May 2 affidavit, this time referring to "cell phone" instead of "TARGET TELEPHONE." *Id*. at 8.

Paragraph 13 is mainly a verbatim reproduction of paragraph 17 from the May 2 affidavit, with three additional misrepresentations at the end of the paragraph. To bolster their probable cause on May 10, SA Barrett created a false veneer over the compromised nature of agents' April 26 attempted controlled buy. SA Barrett falsely claimed that, on April 26: (i) agents observed Defendant entering [Apt. 3B]; (ii) investigators filmed Defendant leaving [Apt. 3B]; and (iii) that their attempted controlled buy was "controlled." *Id*. at 8-9.

The warrant was signed by Magistrate Judge Cynthia Reed Eddy at 7:35pm, granting agents a warrant for Apartment 3B, the black Infinity SUV, and 1433 Crafton Blvd, the residence Defendant had spent the previous four nights. *See* 5/10/17 Apt 3B Search Warrant, attached hereto as Exhibit D-11.

---

[5] Agents turned over numerous items of surveillance video showing the informant's face in discovery. Defendant was easily able to identify the informant because they grew up together, and the informant has a unique physical feature. Any reference by the Government to purported concern for the safety of the informant is farcical and hypocritical.

[6] ¶ 15 from the May 2 search warrant was omitted from the May 10, search warrant.

At approx. 8:10pm, investigators executed the search warrant at 1433 Crafton Blvd. They recovered a firearm, a large amount of cash, but no drugs, despite agents' belief that Defendant was taking drugs from 1433 Crafton Blvd. to the Bryn Mawr Rd. apartment. *See* 5/10/17 302 - Execution of 1433 Crafton Blvd Search, attached hereto as Exhibit D-12.

Agents breach Apartment 3B but did not find the stash house. Instead, they purportedly found some indicia of drugs. The resident of Apt 3B purportedly returned at some point after agents breached 3B, and began immediately cooperating with SA Picinni. The 3B resident purportedly told SA Picinni that they were part of a bagging operation previously, and that the stash house was across the hall in Apt. 3A. In fear that someone in Apt. 3A might attempt to destroy evidence, SA Picinni first called his FBI Supervisor, who concurred that Apt. 3A should be breached. SA Picinni then called AUSA Lanni, who also concurred that Apt. 3A should be breached. Agents then breached Apt. 3A. *See* 6/26/19 NT at 40, attached hereto as Exhibit D-7.

Upon warrantless entry, agents purportedly discovered Arnold Mason attempting to flush a blue bag down the bathroom toilet. Mason then gave agents consent to search the apartment, which they did at 9:32 pm. Agents obtained a search warrant for Apt 3A at 11:32pm. *See* 5/10/17 3A Signed Search Warrant, attached hereto as Exhibit D-13.  Their search yielded a safe containing a large amount of suspected fentanyl, and other indicia of drug distribution. *See* 5/10/17 302 – Search of 3A, attached hereto as Exhibit D-14. Mason also purportedly told agents that the safe belonged to Defendant. Mason was never charged for his role in this case.

## PROCEDURAL BACKGROUND

### Criminal Complaint and Indictment

The probable cause recitation from SA Barrett's May 10, Apt. 3B warrant, including the fabricated corroboration for the April 26 "controlled buy", was reproduced verbatim in the May 11, 2017 criminal complaint affidavit authored by SA Balish. *See* ECF 3-1, 5/11/17 Criminal

Complaint.  Based on these misrepresentations and omissions, Magistrate Judge Cynthia Reed Eddy signed the criminal complaint, charging defendant with intent to distribute 500 grams or more of fentanyl and possession of a firearm by a convicted felon.

On June 8, 2017, a federal grand jury in the Western District of Pennsylvania returned a two count Indictment against defendant for conspiracy to possess with the intent to distribute 400 grams or more of fentanyl and possession of a firearm by a convicted felon. ECF. No. 12.

On April 19, 2018, Defendant filed a Motion to Suppress, wherein a *Franks* hearing was requested because of the misrepresentations made pertaining to observations and video of Defendant entering/exiting Apartment 3B on April 26. ECF 46. Defendant also filed a Motion for Discovery. ECF 43.

**Government's Omnibus Response to Defendant's Pretrial Motions (ECF 48)**

In the Discovery portion of the Government's omnibus response, AUSA Lanni argued that Defendant was not entitled to evidence pertaining to controlled buys, stating:

> "The Government… argues that ***any discovery requested in items a.-j., if they exist, are not governed under Rule 16, as they are not charged in the indictment and therefor not discoverable. Defendant… is attempting to gain information regarding when law enforcement conducted two controlled purchases with him. These events are not charged in the indictment as a delivery of narcotics***. Further, if the court finds that the information requested in these items is discoverable under Rule 16, the Government believes that all of the information is protected confidential source information. All of the information requested with the exception of j. relates specifically to a confidential source. Defendant has not moved to disclose the source of the information. However, defendant by attempting to force discovery of all the salient details of the controlled purchase, i.e., the date, time, place, and amount of narcotics, is essentially attempting to discover the identity of the informant. As to sub-item j., agent reports are specifically not discoverable under Rule 16.

ECF 48 at 5. For those reasons, the Government asked this Court to deny defendant's motion for bill of particulars and discovery in total. *Id*.

To ECF No. 45, the Government responded that it is "aware of its obligation to retain and preserve any Government agent notes, if they exist. To the extent that any of these items as requested above exist, the Government will retain these items and will turn them over to defense with the *Jencks* production as ordered by this Court. *Id*. at 7.

In its response to Defendant's suppression motion (ECF 46), AUSA Lanni restated Defendant's arguments as follows:

> "Defendant still argues that the affidavit falsely claimed that defendant had been observed exiting 3B[;] it relied on information furnished by an informant of undetermined reliability; and it failed to establish a nexus between the alleged criminal activity and the places or premises to be searched."

ECF 48 at 8-9. In response to Defendant's suppression argument, AUSA Lanni stated,

> "... *there was overwhelming probable cause for the warrant as* well as for the places to be searched. *Investigators observed defendant enter 3B on multiple occasions* and even obtained a picture of him leaving the building.[] *Further, the reliability of the informant is not at issue in this case because investigators completely corroborated the criminal activity by arranging the controlled purchase, conducting surveillance of the purchase, and recovering the narcotics from the controlled purchase.*"

*Id*. at 9.

In responding to Defendant's *Franks* motion, AUSA Lanni argued:

> "[Defendant] has not offered any alternative facts or information to contradict or explain the information in the police report… *The Government request[s] that the court examine defendant's version of events for what they are: a fabricated attempt to force an evidentiary hearing* in order to aid discovery and allow defendant an opportunity to cross examine possible Government witnesses."
>
> …
>
> "*The Government submits that there is not false information in the affidavit or material omissions*. Further, even if the statements that defendant claims are false or misleading information or omissions were stricken from the affidavit, there would still be probable cause."
>
> …

> In moving for a Franks motion defendant claims that the first set of search warrants are invalid because "it falsely claimed that defendant had been observed exiting 3B." … [Defendant] must make a substantial preliminary showing that this is indeed false and that the affiant had the requisite state of mind when making this statement. ***Defendant has put forth nothing to show this***.
>
> …
>
> An informant's reliability is irrelevant when the probable cause in the affidavit is based on a controlled purchase of narcotics. *United States v. Heilman*, 377 F.App'x 157, 193 (3d Cir. 2010).
>
> Here, the warrant for location 3B and the other locations is based ***on a controlled purchase of narcotics orchestrated by the FBI***. A ***suspected quantity*** of fentanyl was returned over to the FBI after the controlled purchase. The informant in this case stated that Allen was a fentanyl dealer and provided a phone contact for Allen which the FBI and Pittsburgh Police corroborated. ***Further, investigators observed and even filmed Allen leaving Target Location #1, apartment 3B before the controlled purchase. Further, investigators also observed Allen entering apartment 3B after the informant had set up a call to purchase more fentanyl [on May 10]***. The affidavit also noted that investigators were covertly placed inside the apartment building so they could observe Allen entering the location. …
>
> ***The probable cause in this affidavit was not based on the informant information that Allen was a large-scale fentanyl dealer. It was based on the controlled purchase and recovery by the FBI of a quantity of fentanyl from Allen and independent law enforcement observations of Allen entering and exiting 3B before and after fentanyl deals. This conclusively establishes probable cause of the warrant regardless of the informant's reliability*** and the direct nexus to the place to be searched.

*Id*. at 11-19.

On June 20 and 21, 2018, Defendant filed amended Motions to Suppress and for

Discovery (ECF 52, 53).

**September 29, 2018 Hearing on Pretrial Motions**

On September 28, 2018 this Court held a hearing on pretrial motions. Discovery and

*Franks* issues were discussed, wherein the Defense brought to the Court's attention the fact that a

misrepresentation was made in the May 10 Apt. 3B search warrant. *See* 9/29/18 N.T. at 4-5,

attached hereto as Exhibit D-15. Defense counsel noted that he had been asking for the purported

video referenced by the May 10 search warrant affidavit, indicating the belief that the same does

not exist. *Id*. Counsel further noted that he had sent emails requesting the video, and that he was

led to believe that the video was going to be supplied, but that he had yet to receive it. *Id*. at 6.

In response, AUSA Lanni stated that on this date (9/28/18) the case agent brought him a:

> "disk with all the surveillance photos from that location, [Defendant] coming in
> and out. I'll review that, turn it over to [defense counsel]. And really any time that
> he's seen filmed coming in or out of that location, we'll turn that over to [defense
> counsel] **to the extent that it exists. It may not exist to the extent of all the
> different dates and things that he's stated."** *Id*. at 6-7.

AUSA Lanni then began hedging the government's bet, stating,

> Lanni: We'll address the *Franks* motion later because, Your Honor, let's just say,
> assuming arguendo, there is no video, officers in the probable cause affidavit also
> said they visually saw him come out as well, too. So it could be a
> misrepresentation. It could have been an error. Let's just say it is for the purposes
> of [the *Franks* motion]. It still would not be material or engender him to a *Franks*
> hearing I believe, so –
>
> Court: Why is that?

AUSA Lanni responded that agents still had probable cause from their April 26

"controlled buy", but was checked by the Court, forcing AUSA Lanni to punt the issue to a later

date:

> Lanni: However, if they also saw him coming out of the location personally, with
> their actual eyes as well, I think that would also sustain the probable cause.[7]
>
> Court: And I don't disagree with you. … my point is that *[defense counsel] is
> suggesting that that did not happen either, that the misrepresentation lies in the
> agent not having observed him* –
>
> Lanni: Well, we'll just have to sort that out at a later date.

---

[7] AUSA Lanni's 9/28/18 representation at p. 7, lines 16-18, could be understood to mean that, without agents'
observations of Defendant leaving Apt. 3B immediately prior to the "controlled purchase" on April 26, the
government would not have probable cause. The defense agrees.

*Id*. at 7.

Defense counsel then elaborated on the misrepresentation argument, stating,

> "…there was a misrepresentation by the agents regarding the observation of my client leaving 3B **on the initial and only… controlled buy. There's only one**… and that's based upon their claiming that they observed my client leaving 3B with what they feel would be the contraband that was sold to their controlled source." –

*Id*. at 10.

This Court then reserved ruling on the issue to give counsel the opportunity to hash it out, keeping in mind that AUSA Lanni may need a witness, "who can speak to whether or not this individual observed Mr. Allen entering 3B [on April 26.]" *Id*.

Regarding discovery, AUSA Lanni represented:

> "Your Honor, a lot of this discovery can be transferred over to [defense counsel] today. In the event that there are certain things that are listed that we need to turn over such as the cell phone data placing him at a certain location, as well as public records identifying that some of these location could have been registered or owned to him, I don't believe that I have those available to be turned over today, but I can make – I can have everything available to be turned over shortly, and within – by the end of next week in order to expedite this."

*Id*. at 14.

On October 19, 2018, the Government filed a Supplemental Receipt for Local Criminal Rule 16 Material (ECF 64). The supplemental discovery items included two discs, one containing geolocation data and the other containing surveillance videos.

On December 31, 2018, AUSA Jeffrey Bengel substituted his appearance for AUSA Lanni on behalf of the Government. AUSA Lanni's appearance was terminated. (ECF 73).

On January 4, 2019, this Court filed an Order to Show Cause (ECF 76), instructing the Government to respond with good cause as to why it did not file a response to Defendant's Amended Motion for Discovery (ECF 57).

**AUSA Bengel Responds to This Court's Order to Show Cause**

AUSA Bengel responded on January 31, 2019, apologizing "for not filing a response to defendant's amended motion for discovery, and for any resulting ambiguity about its position on that motion." (ECF 77). He discussed the various requests made by Defendant in his amended motion, and noted that a number of items requested pertained to uncharged controlled buys:

> "[h]owever, the government has not produced the materials described in items (a), (c), (d), (f), (g), and (h), for the reasons set out in its omnibus response to defendant's pretrial motions. [ECF 51 at 3-5]. ***All of these requests relate to two controlled purchases made from defendant by a confidential source. Because these two controlled purchases are not charged as acts of distribution in the Indictment[8], which alleges only a conspiracy***, ***information related to them is not discoverable under Rule 16***. Moreover, producing the requested information would ***risk revealing the identify of the confidential informant***. Defendant has not sought that relief and is not entitled to it. Accordingly, the government maintains its objection to the disclosure of the items described [above].

ECF 77 at 1-2.

On March 5, 2019, AUSA Lanni reentered his appearance on behalf of the Government. (ECF 85).

On June 7, 2019, defense counsel filed a Supplemental Motion to Suppress (ECF 90).

**June 26, 2019 Hearing on Pretrial Motions**

This Court began the hearing by ruling that Defendant's remaining discovery requests were denied as moot because all discovery materials that were properly discoverable had been provided to the defense. See 6/26/19 NT at 5, attached hereto as Exhibit D7.

This Court next addressed an amended motion to suppress filed by Attorney Golden. Regarding the May 5 search warrant for cell phone GPS data, counsel argued:

> "[***the affidavit] doesn't set forth sufficient probable cause, and as a consequence, is defective on its face[.].. Almost everything that comes in after that was seized is a consequence of that particular warrant. We also believe that warrant [has] some statements that are in direct conflict with some of the other search warrant affidavits***. So, we may have a *Franks* issue in regards to that."

---

[8] See p. 25, *infra*, discussing the 8/13/19 Superseding Indictment that charges these two "controlled buys" as acts of distribution.

*Id*. at 7. The Court pressed defense counsel to be more specific wherein counsel stated:

> "… the [May 10] Barrett warrants we believe have a misstatement. I don't know that I can push that it would be an intentional misstatement as much as a due regard for what the truth is. There are two major statements in there about Mr. Allen leaving Apartment 3B. No. 1, that he was observed leaving 3B,…; and No. 2, the government has film of him leaving 3B. that is totally inaccurate… I believe under the circumstances, if you were to take that and carve that out, that the rest of the information set forth in the warrant would not give probable cause to grant a search warrant."

*Id*. at 8.  Counsel then vaguely referenced "further statements in there that are not necessarily accurate and contradict with the [May 5] Piccini affidavit…" *Id*. This Court focused on the *Franks* standard, noting:

> "I don't care whether the information is accurate. That's not the test that would allow for a *Franks* hearing here. So what information do you have that this was either intentional or reckless with respect to the contents of the affidavit?

*Id*. at 9. Defense counsel elaborated:

> "Well, it's the first one where he says he was observed coming out of 3B. That is totally inaccurate. In fact, the government got films to show to the contrary. So we believe that in and of itself is enough for *Franks*."

AUSA Lanni then interrupted defense counsel to correct him regarding the government's statements about 3B, but ended up correcting himself when he actually read paragraph 13, stating:

> "Oh, if we are talking about that portion, it does say investigators filmed him leaving the target location."

Defense counsel then finished his argument, stating:

> "We've shown A, that it's bad, that it's not the truth; and B, we would submit that if you take that out of the affidavit, the affidavit is not going to stand on its own. There is not four feet left. There is three feet left."

The Court then asked for AUSA Lanni's response:

> "At this point, I don't believe there is anything that would engender a hearing as to the May 5th warrant. There is a specific warrant for geolocation data, as well as for the towers that didn't exceed any limit. ***There was more than ample probable cause based on the informant and the controlled buy***. ***I would rely on my moving papers*** [ECF 48]. ***There has not even been an allegation that there was a misstatement or omission in the May 5th warrant***. So I think we're are set on that."

*Id*. at 10-11. This Court then ruled on Defendant's suppression motion, stating,

> "With respect to the May 5th warrant, the Court finds that ***for the reasons set forth by the government, no Franks hearing is appropriate***… since the Court does not find that any knowingly or recklessly made false statements have been raised with respect to that particular warrant."

*Id*. at 11. AUSA Lanni then moved on to the search warrant for Apt. 3B, arguing in a convoluted manner that there has not been a substantial preliminary showing to get the defense to a *Franks* hearing, and that, even if the inaccurate portion were carved out, that there is still "ample probable cause." *Id*.

Defense counsel retorted that the video, or lack thereof, which proves that investigators did not have video of Defendant leaving Apt. 3B on April 26, sufficed to show that an intentional misstatement was made. Beyond that, counsel could not show more for a substantial preliminary showing in the Franks analysis. *Id*. at 12-13.

The Court then asked defense counsel what is to be made of the corroborating evidence of the two investigators that made observations of the defendant exiting Apt. 3B. Counsel then pointed out that the affidavit misrepresented that covert investigators made their observations of Defendant on April 26, since investigators did not make those observations until May 10. The Court then engaged AUSA Lanni:

> Court: Is it not the case, Mr. Lanni, that there exists video of Mr. Allen coming out of April 26?

AUSA Lanni then made the Government's first concession[9] regarding its misrepresentations within the warrant applications.

> AUSA Lanni: The affidavit, ***it's not a specific date***, but, your Honor, ***we do not have video of him specifically coming out of 3B. So, that does not exist***. There is a video of him coming in and around the actual apartment building, and other officers would testify they saw him come out of the apartment building, but there is not film of that."

*Id*. at 14. Despite AUSA Lanni's admission, he continued to argue the validity of the warrant:

> "So, to the extent it's not accurate, it's a misstatement, however, the government would still say there is nothing to show it was intentional or a falsity or reckless in the fact. The government will concede for the purposes of this argument we don't have that. However, even if we take that whole portion out, there is still May 10th, where he is seen going into there, the second part of the affidavit, and that alone would support the affidavit."

*Id*. at 14-15. This Court then pressed further, "[i]s there video of the May 10th […] or is that just based on eyewitness only?" To which ***AUSA Lanni replied that it was based on eyewitness observation and that the representation that video of Defendant entering/exiting Apt. 3B on April 26 was inaccurate***. *Id*. at 15. Defense counsel then aptly submitted:

> "I would submit that if he didn't put in that he filmed [Defendant] coming out of 3B, immediately preceding a controlled sale to a confidential informant, they might not have got their search warrant because they didn't have that particular earlier connection, the nexus between the place to be searched and the drugs they are seeking under the search warrant. Other than that, that's the only argument or the only thing I can point to that supports that it's an intentional misstatement."

*Id*. In ruling on the suppression/*Franks* issues pertaining to the Apt. 3B warrant, this Court maintained its reliance on AUSA Lanni's argument that "***there was more than ample probable cause based on the controlled buy and the informant***" (*id*. at 10), by stating:

> "I don't know that [Defendant] demonstrated that it's an intentional misstatement, … first off. Secondly, the Court finds that probable cause would exist in the warrant notwithstanding the fact even if we were to carve out that incorrect

---

[9] Although AUSA Lanni conceded the nonexistence of video of Defendant exiting Apt 3B, he misrepresented to this Court that the warrants didn't specify a date. *Id*. at 14. The May 5 and May 10 warrant affidavits clearly refer to the April 26 so-called "controlled buy."

information. So, that motion is denied to the extent it seeks suppression of the first warrant [Apt. 3B warrant] and also to the extent that it seeks a *Franks* hearing with respect to it.

*Id*. at 15-16.

SA Picinni then took the stand and described the entry into Apt. 3B. *Id*. at 27-28. Agents cleared the apartment without finding anyone, then initiated a search that came up with scales and white powder they believed was fentanyl or another drug, and stamp bags. *Id*. at 29. The individual residing at Apt 3B eventually returned and was purportedly interviewed by agents. According to SA Picinni,

> "This individual advised me that for a brief period, I believe a couple, maybe three weeks, they were part of a large-scale fentanyl packaging group and that specifically the white powder that we found in the house was the same stuff that individual packages and specifically that we had entered the wrong apartment… They advised that that area is located in 3A across the hall."

*Id*. at 30-31. SA Picinni further claimed to be concerned with the destruction of evidence in 3A because of the loud commotion agents made when entering 3B. *Id*. at 32. SA Picinni also admitted that 3B was not the "main distribution … place that we thought we were going to find." *Id*. at 36.

After discussing the circumstances agents confronted after entering 3B, SA Picinni and AUSA Lanni discussed breaching Apt. 3A without a warrant:

> SA Picinni: I'm not sure of the sequence of events but I did two things. I called my supervisor, my direct supervisor. I advised him of basically all the situations and scenarios that we've talked about, safety issues, probable cause to believe that the drugs were in a separate location. I advised of the interview… and advised my supervisor that it was my belief that we needed to secure Apartment 3A.
>
> AUSA Lanni: What was your supervisor's advice or guidance at that point?
>
> SA Picinni: Concurrence.
>
> AUSA Lanni: Did you take any other steps before going in and actually securing that apartment?

> SA Picinni: I did… I contacted AUSA Tim Lanni… I advised of the same situation, I advised of my beliefs, and you concurred with my assessment.

*Id*. at 40.

SA Picinni then described the sequence of events between agents' forced entry into 3B, their arrest of Defendant, and their application for search warrants:

> SA Picinni: I took Mr. Allen's vehicle and followed behind and parked in that parking lot.
>
> AUSA Lanni: What was the purpose of bringing Mr. Allen to that location rather than leaving him on the street where the traffic stop occurred?
>
> SA Picinni: ***My intention that day of May 10th was not to execute any of the search warrants***.
>
> AUSA Lanni: Okay. Why not?
>
> SA Picinni***: I didn't know the apartment inside the complex to write a warrant for***.
>
> …
>
> ***Events were dynamic that day and they went a different path and we adjusted as it went along.***
>
> AUSA Lanni: What is one of those events that sped up the process in this case or what occurred to some of the investigators?
>
> SA Picinni***: There were two events. The first event was while we were conducting surveillance, a surveillance member who was fairly offset of the complex but could see with binoculars was made on surveillance***.
>
> AUSA Lanni: What do you mean "made on surveillance."
>
> SA Picinni: ***That individual was looking through their binoculars when a person approached their vehicle. After approaching the vehicle, that individual walked into that same complex***.
>
> …
>
> AUSA Lanni: After that individual walked into there, ***how did the investigative plan kind of change?***

23

SA Picinni: *The plan was now we are going to execute search warrants on this day [May 10]*.

AUSA Lanni: Then all of that changed. So, when you pulled over Mr. Allen, he was taking a move to a different location. Obviously you say you didn't want to execute the search warrant. Still *when you had Mr. Allen there, was there a possibility that you could prevent having to physically execute them and do all that?*

SA Picinni: *Yes*. What I wanted to do was to enter these places or first gain more intelligence on the operation and potentially give Mr. Allen an opportunity to cooperate**…**

*Id*. at 42-45.

On cross examination, defense counsel asked SA Picinni about the covert investigators that observed Defendant enter Apt. 3B. This line of questioning evoked an objection from AUSA Lanni:

AUSA Lanni: Your Honor, I'm going to object to this line of questioning. We already resolved the issue related to 3B. I believe this is outside the scope of direct.

*Id*. at 50-51.

SA Picinni also confirmed on cross that agents did not learn of Apt. 3B until May 10, and that the informant never provided information about the location of a stash house. *Id*. at 51. *SA Picinni's concluded his cross examination by stating that he could have arrested Defendant after [the] April 26 [controlled buy]. Id*. at 62.

On redirect, SA Picinni confirmed that no indicia was found connected to Defendant. *Id*. at 64. SA Picinni then falsely confirmed for AUSA Lanni that agents only knew of Defendant entering Apt. 3A one time. *Id*. at 64-65.  AUSA Lanni then asked the final redirect question:

AUSA Lanni: All the information you have is he went there essentially with a large amount of fentanyl, dropped it off and left?

SA Picinni: A bag of something.

*Id*. at 65.

**Superseding Indictment Charged Defendant with Two Controlled Buys**

On August 13, 2019, the Government filed a superseding indictment, adding two additional charges for two acts of distribution[10] on April 26 and May 10:

> Count 2: Distribution and Possession with Intent to Distribute 40 Grams or More of Fentanyl, a Schedule II controlled substance. April 26, 2017 – 21 U.S.C. §§841(a)(1) and 841(b)(1)(B(vi)
>
> Count 3: Distribution and Possession with Intent to Distribute 400 Grams or More of Fentanyl, a Schedule II controlled substance May 11, 2017 – 21 U.S.C. §§841(a)(1) and 841(b)(1)(A)(vi)

ECF 108.

On September 3, 2019, the Government filed a Supplemental Receipt for Local Criminal Rule 16 Material. ECF 133. The disclosure included two discs containing recordings of the purported controlled buys.

Also on September 3, 2019, this Court granted a Defense Request for Extension of Time to file pretrial motions, also noting that the Court will not entertain further discussion on Defendant's Suppression/*Franks* issues:

> "In particular, as stated by Defendant's counsel at today's hearing, additional time is necessary for discovery, research and investigation and for the filing of additional pretrial motions in light of the new charges in the Superseding Indictment… ***The Court does hold, however, that any pretrial motions filed that raise arguments and issues already addressed by the Court, see Docs. 57 and 94, will be summarily denied.***"

ECF 126.

On September 4, 2019, the Court granted prior counsel Keith Golden's motion to withdraw, and appointed a federal public defender to represent Defendant.

---

[10] *See* ECF 77, discussed, *supra*, wherein AUSA Bengel noted that the individual acts of distribution had not been charged in the initial Indictment.

On September 30, 2020, AUSA Lanni was terminated as representing the government in this matter. ECF 179. Around the same time, AUSA Lanni resigned from the Western District of Pennsylvania. *See* ECF 212, at 2.

On October 16, 2020, AUSA Katherine Jordan substituted her appearance for AUSA Tonya Goodman. ECF 181.

With the defense investigation into the Superseding Indictment advancing, the defense filed a motion on January 7, 2022 for a detention hearing. (ECF 202). On March 22, 2022, the defense emailed a subpoena to AUSA Lanni to testify at the bond hearing. On March 28, 2022, AUSA Jordan filed a Motion to Quash Subpoena to AUSA Timothy Lanni (EDPA). ECF 212. The Government noted this Court's prior rulings in favor of the Government:

> "In Her Honor's [September 3, 2019] order, she indicated that "any pretrial motions filed that raise arguments and issues already addressed by the Court will be summarily denied." (ECF 126).

*Id*. at 2. The Government then leaned on this Court's suppression ruling, arguing essentially that Defendant's opportunity to test the weight of the evidence had passed:

> "As a result of the unique timing of the detention hearing in the procedural history of this case, ***defendant … has already had the opportunity to question the weight of the government's evidence against him by way of a suppression motion***."

*Id*. at 4.

**Defendant's March 31, 2022 Bond Hearing**

Task Force Officer Pollock testified for the Government. While discussing the April 26 "controlled buy", the following exchange occurred:

> AUSA Jordan: Then on April 26, 2017, did you become involved in surveillance of an investigation at 77[1] Bryn Mawr in the City of Pittsburgh?
>
> TFO Pollock: Yes, that's correct.

> AUSA Jordan: And did you actually participate in the surveillance in that investigation personally?
>
> TFO Pollock: I did.
>
> …
>
> AUSA Jordan: And **was the confidential source and his or her vehicle, if necessary, searched for money, drugs, or contraband prior to the controlled purchase?**
>
> TFO Pollock: **Yes. That's the policy that's followed for those situations**.
>
> AUSA Jordan: **After the confidential source was observed meeting with Mr. Allen, did he or she then return to investigators and turn over that amount of fentanyl?**[11]
>
> TFO Pollock: **That's correct**.[12]
>
> AUSA Jordan: Based on that, did FBI Agent Len Picinni… apply for a ping or E-911 order for the telephone that was used to set up the …controlled buy? []
>
> TFO Pollock: He did.
>
> …

*Id.* at 10-13. Then, for the first time in nearly four years, the Government switched its position on

the number of "controlled buys" it had on Defendant, when it acknowledged that there was no

controlled buy on May 10:

> AUSA Jordan: And prior to the execution of the search warrants, did law enforcement, again, have the confidential source attempt to arrange a controlled purchase from the defendant?
>
> TFO Pollock: Yes…

---

[11] This exchange took place merely a few months before the Government disclosed the 302 proving that the vehicle and driver were not searched or secured, and that there was an hour-plus break between informant turning the recorder off in the compromised vehicle, being dropped off at his residence, then meeting with agents. *See* Exhibit D-2.

[12] To be clear, TFO Pollock's misrepresentations on March 31, 2022 were based on his review of the April 26 reports, not actual observation of the informant. TFO Pollock was involved in surveilling the Crafton Blvd. residence. *Id*. at 26-27.

> AUSA Jordan***: Is it fair for me to say that that controlled purchase never actually happened?***[13]
>
> TFO Pollock: ***That's correct****.*

*Id*. at 23.

Significantly, TFO Pollock also testified that, although he believes he observed Defendant exit Apt. 3B, he did not observe Defendant with the white TGI Fridays bag that was indicated by the other detectives. *Id*. at 31-32.

During her argument, AUSA Jordan continued the Government's changing narrative on precisely what Defendant was charged with in the Superseding Indictment:

> AUSA Jordan: …defendant is charged with conspiracy to distribute more than 400 grams of fentanyl, ***delivery of greater than 40 grams of fentanyl, and possession with intent to distribute more than 400 grams of fentanyl***, in addition with a 922(g) firearm charge.

*Id*. at 40. She then further argued:

> AUSA Jordan: … I think that the weight of the evidence against the defendant is significant. ***There is a controlled purchase that was recorded***….

*Id*. at 41. In assessing the strength of the evidence against Defendant, AUSA Jordan noted:

> AUSA Jordan: … We're at sort of a different posture than usual where ***motions to suppress have already been litigated. So as far as strength of the evidence, all of the evidence has been ruled as admissible***…

*Id*.

Undersigned counsel then argued the weight of the evidence by drawing the court's attention to the abrupt change in position from the United States Attorney's Office:

> Defense: … what I wanted to initially draw the court's attention to was ***something significant that AUSA Jordan had mentioned. And that was that no May 10 controlled buy occurred. That's critical, Your Honor, because… Mr. Allen was superseded on a count for a controlled buy on May 10.*** Essentially, the government believed that Mr. Allen was conducting… this drug dealing enterprise from these locations. And as Det. Pollock indicated, when they went

---

[13] Compare to ECF 77 at 1-2, wherein AUSA Bengel notes two controlled buys. *See also* ECF 48 at 5, wherein AUSA Lanni represented that two controlled buys were conducted with Defendant.

into 3B, they did not find what they though that they were going to find. They did not find a stash house. There is also the evidence that was found on Mr. Allen after he left the Bryn Mawr apartment complex. And… he was not arrested with any drugs during that traffic stop. So the evidence that was collected, it does not point towards Mr. Allen as a drug dealer. And that has been one of the… strange aspects of this case…

Court: … ***Judge Bissoon has already ruled on the motions to suppress. You can argue weight of the evidence, but I am not going to allow us to reopen or revisit that. In fact, she had specifically addressed that any pretrial motions raising the same issues dealt within the suppression motion would be promptly denied***…

Defense: Your Honor, if I may, ***this is the first time that the government has taken the position that a controlled buy did not occur on May 10***… So that was why I'm discussing it in these terms.

Court: That's a motion to raise before Judge Bissoon.

*Id*. at 44-46. Before the hearing ended, the court gave AUSA Jordan the opportunity to clarify

the Government's change of position:

Court: … And Attorney Jordan, I did want to turn to you to clarify one matter. Mr. Jubas made a comment in his argument as to the superseding indictment. Do you want to address that? I just always want to make sure everyone has the opportunity to be heard.

AUSA Jordan: I do, Your Honor. Count 3, I was sort of surprised when I heard that. Count 3 of the indictment does not allege a controlled buy. ***What is alleged is that the defendant was in possession with the intent to distribute narcotics, and the government's position would be that those were the narcotics that were recovered from the various locations where the search warrants existed.***

*Id*. at 50.

**Third Amended Motion for Discovery (ECF 219)**

On May 2, 2022, the Defense filed its Third Amended Motion for Discovery. ECF 219.

In that motion, the defense proved that, on April 26, there was an hour-plus break between

informant turning his recorder off and meeting with agents to turn over the purported drugs. ECF

219 at 2-7. Defendant then requested the following items in discovery:

a. Date, time, place of consensually recorded phone call setting up April 26, 2017 purported controlled buy;

b. Identity and criminal history of the individual that drove CS1 to and from the purported April 26, 2017 controlled buy;

c. Make and model of the vehicle used to transport CS1 to and from purported April 26, 2017 controlled buy;

d. All surveillance recordings and other documentation pertaining to surveillance of CS 1 and the unidentified individual that transported CS1 to and from the purported April 26, 2017 controlled buy;

e. Hour plus portion of April 26, 2017 controlled buy recording between CS 1's purported controlled buy with Mr. Allen and his handing over the recording device to law enforcement;

f. June 7, 2017 and August 13, 2019 Grand Jury transcripts;

*Id*. at 8. The Defense also noted a May 16, 2022 conference wherein undersigned counsel would meet with AUSA Jordan to discuss these requests. *Id*. at fn 3.

**Third Amended Motion to Suppress Evidence (ECF 220)**

Additionally, on May 2, 2022, Defendant filed his Third Amended Motion to Suppress (ECF 220), drawing the Court's attention to the hour-plus gap between informant turning his recorder off and turning the drugs over to agents; the unreliability the informant; the botched May 10 surveillance operation and subsequent change in agent' plans; the misrepresentations made by SA Barrett in his May 10 affidavits. *Id*. at 2-8.

Additionally, the Defense asserted standing to challenge the evidence collected from the Crafton Blvd residence and the Infinity SUV. *Id*. at 8-9.

To establish a substantial preliminary showing for purposes of a *Franks* hearing, Defendant submitted the following misrepresentations and omissions within the Apt. 3B search warrant:

- It omitted from the affidavit that CS1 was transported to and from the purported controlled buy by an apparent jitney driver. It further omitted any reference to searching the jitney vehicle before or after the purported controlled buy.

- It claimed, with reckless disregard for the truth, that immediately prior to the April 26, 2017 controlled purchase, investigators observed Defendant exit Apartment 3B, and that investigators filmed Defendant leaving 3B;

- It claimed with reckless disregard for the truth, that upon completion of the April 26, 2017 controlled buy transaction, agents met with CS 1 at a pre-determined meeting location and recovered a quantity of alleged fentanyl;

- It omitted from the affidavit that a more than hour long gap existed between the April 26, 2017 meeting with CS 1 and Defendant, and the meeting of CS and agents at the predetermined location.

- The affidavit further omitted that CS 1 was demonstrably unreliable given his past criminality, including a high-speed chase from police that ended in significant injury;

- It claimed, with reckless disregard for the truth, that covert investigators inside the apartment complex at 771 Bryn Mawr Rd. observed Allen enter Apartment 3B with a large bag;

*Id*. at 11-12.

### Government Finally Discloses Fatal Flaws in Purported April 26 Controlled Buy

On May 24, 2022, after Defendant brought the informant's compromised driver and the hour-plus gap to this Court's attention, the Government finally provided the highly relevant *Brady* evidence that it had been withholding. *See* 5/24/22 Encrypted Email, attached hereto as Exhibit D-16. The Government provided two pieces of evidence:

i.   A recording of a recording[14] of a purported phone call between defendant and informant;

---

[14] Between the audio loops at the beginning of the "controlled buy" recording, and the recording of a recording that the defense was provided of the phone call that purportedly set the "controlled buy" up, the government's April 26 recordings are suspect, and must be scrutinized in a *Franks* hearing.

ii.     A previously undisclosed 302 that provided surveillance information about the informant's driver. *See* 4/26/17 Informant Surveillance 302, attached hereto as Exhibit D-2.

The 302, authored by SA Balish, provided the following, previously undisclosed details

regarding the purported April 26 controlled buy:

i.      SA Balish misrepresented the roles of the purported recorded call. He attributed the informant's remarks to Defendant, and vice versa;

ii.     The CHS was fitted with a transmitter, given official funds and was ***returned to his/her residence where under surveillance the CHS was picked up by a Subaru Legacy… and drove to the meet location at Bryn Mawr Rd***…;

iii.    Surveillance teams were in place in the area of Bryn Mawr apartments. **The CHS arrived in the area** and entered a black Infinity SUV on Anaheim Street.;

iv.     **The CHS stated** the target vehicle circled the black and CHS exited on Anaheim street and got back into the Subaru Legacy;

v.      ***At approximately 12:55pm the CHS was returned to his/her residence by the Subaru.*** The CHS then made contact with SA Picinni and met with TFO Mordaunt and SA Balish at a predetermined location to be debriefed;

vi.     During the debriefing, ***the CHS stated***, inter alia, ***that an unknown male was in the black SUV with Defendant and handed the CHS fentanyl;***

vii.    SA Balish and TFO Mordaunt took custody of the suspected fentanyl and drove in tandem directly to FBI Pittsburgh HQ and packaged the evidence and then secured it into Evidence Control.

*See Id.*

**Motion to Compel Disclosure of Confidential Human Source and Unwitting (ECF 228)**

On June 3, 2022 with more knowledge of the compromised controlled buy operation and

the "unwitting" in hand, Defendant filed a Motion to Compel Disclosure of Confidential Human

Source and Unwitting. ECF 228. Defendant requested identities of both the informant and the

Subaru Driver (unwitting), and all *Brady/Giglio/Jencks* materials pertaining to both individuals.

*Id.*

**July 5, 2022 Hearing – Denial of Suppression and *Franks* Request (ECF 231)**

Despite the mounting evidence of a lack of reliability and candor throughout the entirety of the Government's case, this Court relied on the Government's arguments and denied Defendant's Motion to Suppress and for a *Franks* hearing (ECF 220). The Court further ordered the Government to respond to Defendant's Motion to Compel Disclosure of Confidential Human Source and Unwitting. ECF 232.

At the conclusion of the hearing, AUSA Jordan noted that the Government would be filing a Superseding Indictment to comport with the constitutional requirements necessary to allege that Defendant is an armed career criminal.

**Government's Response to Motion to Disclose Informant (ECF 233)**

On July 8, 2022, the Government responded to Defendant's Motion to Disclose CHS and Unwitting (ECF 228). Awkwardly, the Government argued that its confidential informant was not a confidential informant:

> "***In Document 229, Defendant moved to compel the prosecution to identify individuals he refers to as a "confidential human source"… Citizens who are relied upon to covertly assist criminal investigations, but who are not thereafter called upon to testify at trial are often referred to as "confidential informants." The person Mr. Allen refers to as a confidential human source (CHS) is not a confidential informant in that sense. To the contrary, if a trial is necessary to resolve Mr. Allen's case, that person will be called to testify just like the other trial witnesses. The prosecution intends to provide the names of its witnesses to the defense before the trial begins*. In addition, the prosecution intends to disclose whatever Brady/Giglio information that may exist, and that has not already been disclosed, sufficiently in advance of trial for Mr. Allen to be able to make effective use of it*.**

*Id*. at 1-2. Hedging its contradictory bets, the Government argued, citing *Roviaro*:

> Even if the person Mr. Allen refers to as a CHS was a "confidential informant" within the standard meaning of that term, his motion to compel the prosecution to identify that person at this time would be improper and unjustified. In *Roviaro v. United States*, 353 U.S. 53, 59 (1957), **the Supreme Court explained "that protecting an informant's identity serves important law enforcement objectives,**

>*most significantly, the public interest in encouraging persons to supply the*
>*public with information concerning crimes*."[15] *United States v. Brown*, 3
>F.3d 673, 679 (3d Cir. 1993). To further this interest, the Supreme Court has
>recognized a privilege held by the prosecution "to withhold from disclosure the
>identity of persons who furnish information of violations of law to officers
>charged with enforcement of that law." *Roviaro*, 353 U.S. at 59.
>
>>"*The purpose of the privilege is the furtherance and protection of the*
>>*public interest in effective law enforcement*. The privilege recognizes the
>>obligation of citizens to communicate their knowledge of the commission of
>>crimes to law enforcement officials, and, by preserving their anonymity,
>>encourages them to perform that obligation." *Id*. The Court in *Roviaro* explained
>>that, in reviewing a defense request to compel disclosure of the identity of an
>>informant despite the privilege, the public interest in protecting the flow of
>>information should be weighed against the defendant's right to prepare his
>>defense. *Id*. at 62. ***The need to protect the safety of informants has been***
>>***recognized as a critical factor in this balancing test***. *Virgin Islands v. Martinez*,
>>847 F.2d 125, 127-28 (3d Cir. 1988).
>
>>Assuming, arguendo, that the confidential human source is unavailable to
>>testify and is, therefore, a "confidential informant", the Court, in applying the
>>*Roviaro* balancing test, should deny the defendant's motion to reveal the
>>individual's identity.

ECF 233 at 2-3. Throughout the remainder of its Response, the Government discussed

Defendant's burden in demonstrating the need for disclosure of the informant. *Id*. at 3-4. Noting

the "most significant[]" factor, the Government stated:

>"Perhaps most significantly, on April 26, 2017, the informant was not the sole
>participant, other than the defendant, in the controlled purchase. The controlled
>purchase occurred in the defendant's vehicle, with another individual present.
>***That individual, who was not identified by law enforcement***,[16] actually provided
>the CHS with the narcotics. Given that this individual was in the defendant's car,
>it is axiomatic that the defendant knows the identity of the individual and could
>call him to testify. The fact that the defendant and CHS were not the sole
>participants in the controlled purchase argues against disclosure of the CHS'
>identity."

*Id*. at 4. In conclusion, the Government restated its thesis on the informant:

---

[15] Again, the Government feigned concern for protecting the identity of the informant from Defendant, despite the fact that the Government made no effort to conceal the informant's identity in its surveillance video, thereby revealing the informant's identity to Defendant.

[16] Stated another way, the existence of this additional person in the car is entirely dependent on the word of the informant, not any independent corroboration by surveillance. Also, a review of the recording of the meeting between Defendant and informant provides no indication that another individual was in the vehicle.

"The defendant has failed to meet his burden of establishing that the disclosure is necessary, ***particularly when balanced against the public interest in protecting the flow of information and need to protect the safety of informants***."

*Id*. at 5. Next, the Government argued against disclosure of the identity of the "unwitting" (driver of unsecured Subaru), as a confidential source:

"… defendant has not met his burden of proving that the information is necessary to his defense. Undeniably, the defendant makes no claim in his motion that the "unwitting" would have any information that would assist the defendant in his defense. There is no claim that the "unwitting" was a witness to any interaction between the defendant and the CHS, that the unwitting had highly relevant testimony, that the "unwitting" could reveal potential entrapment, that the "unwitting" could testify in any way in a manner which would throw doubt on the defendant's identity, or could otherwise be necessary and material to the defense. ***The "unwitting was not an active participant or eyewitness***. He was not even a "tipster." ***The government is not in possession of the identity of this individual***. However, even if the Government were to become aware of the person's identity, the defendant has not met his burden to prove that he is entitled to disclosure of the information."

*Id*. at 5. Underscoring the Government's utter lack of awareness of its own investigation, the Government concluded by arguing that the identity of the informant and the unwitting are not *Brady* material, but welcomed the Defense's help in identifying such *Brady* material:

"Finally… the defendant argues that evidence of the of the CHS' identity is "also likely to be relevant to impeaching the CHS and law enforcement officer that dealt with the CHS, and is therefore discoverable as *Brady* material. *Giglio v. United States*…"
***Counsel for the Government is aware of the Government's obligations to produce Brady and Giglio materials, to the extent that it exists. The prosecution welcomes the assistance of the defendant is meeting its responsibility to provide exculpatory and/or impeachment information pursuant to the principles established in Brady v. Maryland***…"

*Id*. at 6-7. In a final footnote, the Government hedged its bets yet again on *Brady* material, relying on its consistent aloofness about its own investigation:

"To the extent that the defendant believes the self-edited call log demonstrates the existence of *Brady* or *Giglio* material, ***particularly material that would come to light with disclosure of a CHS, the Government is unaware of such material***."

*Id*. at 7, fn 1.

**This Court Denied Defendant's Informant Requests at ECF 219 and 228**

On August 31, 2022, the Court denied Defendant's Motion to Compel Disclosure of

Confidential Human Source and Unwitting, as well as Requests 36(a) and (b) of Defendant's

Third Amended Motion for Discovery. (ECF 234). Specifically, the Court noted in its Order:

> "Defendant's request to compel disclosure of the identity of the Government's
> Confidential Human Source (CHS) is denied as premature. ***Unlike the informant
> in Roviaro v. United States, 353 U.S. 53 (1957) the Government here has
> represented that it intends to call the CHS as a witness at trial and will provide
> the names of its witnesses, including the CHS, to the defense before trial begins***.
> To the extent the information sought is *Brady*/*Giglio* material, the Government
> will be required to produce such material at least ten days before trial pursuant to
> the Court's standard pretrial order. Defendant's request to compel disclosure of
> the identity of the unwitting driver of the Subaru is denied as moot because the
> Government has represented that it does not know the individual's identity. In
> addition, Defendant has not made any claim in his motion that the unwitting
> would have any information that would assist him in his defense.

*Id*.[17]

**Government Pulls About Face, Revealing April 26 "Controlled Buy", and Therefore its
Probable Cause, as House of Cards**

After an Amended Final Pretrial Order (ECF 246), AUSA Stephen Kaufman entered his

appearance for the Government. ECF 247. The Government then launched the final steps in its

desperate scheme to evade scrutiny of its failed April 26 controlled buy operation, which

represents the entirety of its probable cause for its search warrants in this case.

On November 14, 2022, the Government filed a Motion Regarding Disclosure of

Confidential Human Source's Identity. ECF 248. After noting that this Court's Order (ECF 234)

relied on the Government's representation that it would call the CHS at trial and that defendant

---

[17] Shortly after this Court's Order at ECF 234, the Government filed a Sealed Motion (ECF 239), to which this
Court filed a Sealed Order (ECF 240, 241). The Defense has no idea what this Sealed Motion or Order entailed.

would receive *Jenks*/*Brady*/*Giglio* disclosures pertaining to the informant, the Government

stated:

> ***"The Government has since elected not to proceed on Count Two of the
> Superseding Indictment*** *… **This count was based upon a "controlled
> purchase**"*[18] *of fentanyl executed by the CHS on April 26, 2017.*
>
> As the Government has determined that it will not proceed on this Count,
> ***the CHS will no longer be called to testify as a Government witness***… The
> Government is filing this Motion in the event that the defendant wishes to renew
> his Motion previously filed at ECF 228, now that the Government has stated that
> it does not intend to call the CHS as a witness at trial."

ECF 248 at 1-2. The Government added its final hedge to its arguments on *Brady* material,

noting:

> ***"While there is Giglio material related to the CHS, which would have been
> disclosed in the event the CHS testified, the Government is unaware of any
> purely exculpatory Brady material with respect to the CHS, i.e., information
> which would tend to show the defendant's actual innocence."***

*Id*. at fn 2.

The Government then went on to argue contradictory positions from its prior

representations to this Court. The Government's accompanying argument can only be described

as nonsense that lacks logic and candor, and will not be addressed further. *See* ECF 248 at 2-4.

**Government Files Second Superseding Indictment – Tacitly Admitting That It is Incapable
of Proving the April 26, 2017 "Controlled Buy"**

On November 15, 2022, the Government filed its Second Superseding Indictment,

dropping the April 26, 2017 "controlled buy", one day after this Court's due date for Motions in

Limine. *See* ECF 246.

In response to the Government's transparent contradictions, Defendant filed a Motion for

Extension of Time to Prepare for Trial (ECF 255) calling into focus the Government's exposed

---

[18] In a small, but positive, development in the Government's struggles with candor in this case, the United States
Attorney's Office finally realizes the importance of quotation marks when it mentions the April 26 "controlled buy."

and entirely compromised April 26 "controlled buy." This Court called a hearing for the following business day. At that hearing, this Court cancelled the trial date, noting that a trial date would not be set until after pretrial motions were handled. The Court also noted that Defense Counsel had not made any misrepresentations in his Motion for Extension of Time at ECF 255. ECF 257.

### MOTION IN LIMINE TO PREVENT GOVERNMENT WITNESSES FROM TESTYING, AND PROSECUTORS FROM ARGUING, THAT A "CONTROLLED BUY" WAS CONDUCTED ON APRIL 26, 2017

All previous paragraphs are included in their entirety as if fully restated herein.

Agents and prosecutors can truthfully refer to their April 26 operation as a "surveillance operation", a "botched controlled buy", an "uncontrolled buy", or an "attempted controlled buy." However, basic scrutiny of the government's April 26 operation reveals that numerous extraneous, compromising, and compounding factors prevent the operation from being considered "controlled." Those extraneous factors include:

    i.    The informant, whose reliability was not established, had the ability to turn his audio recorder on and off;

    ii.    The informant was driven to the meeting with Defendant by an unidentified, unsearched, unsecured individual (compromised individual), in an unsearched and unsecured vehicle (compromised vehicle);

    iii.    Agents failed to maintain surveillance of the informant during numerous, critical stages of the operation, including when informant:
        a.  Exited the compromised vehicle and entered Defendant's vehicle;
        b.  Conducted the purported transaction with Defendant;
        c.  Exited Defendant's vehicle, and reentered the compromised vehicle;
        d.  Exited the compromised vehicle and entered his residence;

    iv.    The informant turned the recorder off prior to exiting the compromised vehicle and entering his residence;

    v.    More than an hour passed between informant turning the recorder off, ostensibly being dropped off at home by the compromised vehicle, and informant meeting with agents and handing them the alleged fentanyl;

vi.   The recorder was not turned back on until informant met with agents - more than an hour after he turned it off in the compromised vehicle.

*See* 4/26/17 Informant Surveillance 302[19], attached hereto as Exhibit D-2.

For the five-year life of the case against Defendant, the Government has made a mockery of Due Process; its Duty of Candor to this Honorable Court and to Magistrate Judge Cynthia Reed Eddy; and its various disclosure obligations to Defendant, by consistently maintaining that their botched April 26 operation was a "controlled buy," all the while remaining in blissful ignorance of the compromised nature of its investigation into Defendant by failing to perform a diligent investigation into its own case.

From the outset, Defense counsel has diligently pointed out the clear shortcomings in the search warrants the Government sought throughout its investigation. The Government was finally forced to drop its April 26 "controlled buy" charge when Defendant refused the plea deal and demanded the Government prove its case at trial. The Government didn't drop this charge because it had a change of heart, or because they are cutting Defendant a break. ***They dropped the charge because the evidence proves that a controlled buy did not occur, that their informant is demonstrably unreliable, and that agents and prosecutors have lied about the probable cause in this case since May 5, 2017.***[20]

**Analysis**

The Cambridge Dictionary defines "controlled" as involving careful, intentional actions that limit risk or danger. *See* Dictionary.cambridge.org/us/dictionary/English/controlled.

Another helpful definition is "control experiment," which is defined as, "an experiment in which all variable factors have been kept constant and which is used as a standard of comparison

---

[19] This piece of evidence was not turned over until after Defendant discovered these problems and alerted the Court at ECF 219, 220, 228. *See* 5/24/22 encrypted email from AUSA Jordan, attached hereto as Exhibit D-16.

[20] An investigation should be conducted into the Government's handling of this case.

to the experimental component in a controlled experiment." *See* merriam-

webster.com/dictionary/control%20experiment.

A verb phrase for "control for," as in statistics, is also telling: "to account for (variables

in analysis) by limiting the data under consideration to a comparison of like things." *See*

Dictionary.com/browse/control.

The April 26 surveillance operations simply suffers from too many extraneous,

compromising, and compounding factors to be considered "controlled." On the contrary, the

evidence proves a demonstrated lack of control by agents. Agents provided their informant with

an audio only recorder that he could turn on and off. He was picked up from his house by an

unsearched, unsecured vehicle that was driven by an unknown, unsearched, and unsecured

individual. He turned the recorder on while in the compromised vehicle. Agents failed to

maintain surveillance on the informant as he exited the compromised vehicle and entered the

black SUV with Defendant. A vague conversation is recorded wherein nothing is clearly

discussed pertaining to drugs. Surveillance units observed no transactions between Defendant

and their informant. Then, also outside of the view of surveillance units, the informant exited the

black SUV with Defendant and reentered the compromised vehicle. After asking the

compromised driver to take him home, the informant turned the recorder off. From there,

apparently, the informant was dropped off at his residence, made contact with SA Picinni, then,

more than an hour later, met with agents at the predetermined meeting location.

Since then, agents and prosecutors have undertaken a campaign of deception upon the

Courts to preserve their case against Defendant.

**Remedy**

The Local Rules of Court for the Western District of Pennsylvania state, in pertinent part:
LCvR 83.3. RULES OF DISCIPLINARY ENFORCEMENT FOR ATTORNEYS

A. Introduction.

1. Responsibility of Court. The United States District Court for the Western District of Pennsylvania, in furtherance of its inherent power and responsibility to supervise the conduct of attorneys who are admitted to practice before it, or admitted for the purpose of a particular proceeding (pro hac vice) promulgates the following rules of Disciplinary Enforcement superseding all of its rules pertaining to disciplinary enforcement heretofore promulgated.

2. **Adoption of Rules of Professional Conduct**. Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with others, that violate the rules of professional conduct adopted by this Court shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney client relationship. The rules of professional conduct adopted by this Cout are the rules of professional conduct adopted by the Supreme Court of Pennsylvania, as amended from time to time, except that Rule 3.10 has been specifically deleted as a rule of this Court, and as otherwise provided by specific order of this Court.

3. **Sanctions for Misconduct**. For misconduct defined in these rules, any attorney admitted to practice before this Court may be disbarred, suspended from practice before this Court, reprimanded or subjected to such other disciplinary action as the circumstances may warrant.

Pennsylvania Rule of Professional Conduct, Rule 3.3 Candor Toward the Tribunal, commands:

(a) A lawyer shall not knowingly:

(1) Make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) …

(3) Offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence before a tribunal… and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence, other than the testimony of a defendant in a criminal matter, that the lawyer reasonably believes is false.

(b) …

(c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.

The Government's arguments regarding the April 26 "controlled buy" throughout this case illustrate an ongoing pattern of misrepresentations, and an overall lack of candor to the federal courts by agents and the United States Attorney's Office. During the early stages of this

case, AUSA Lanni maintained that two controlled buys with Defendant took place, ECF 48 at 5; that the Government had "overwhelming probable cause", *Id*. at 9.; that the reliability of the informant was not at issue, *Id*.; and that the April 26 controlled buy was completely corroborated by surveillance. *Id*.

Since AUSA Lanni has left the case, his representations on the two "controlled buys", probable cause, and the case against Defendant generally, have been entirely eroded. First, the Government lost the May 10 controlled buy when AUSA Jordan took over and admitted that there was no controlled buy on May 10th. *See* 3/31/22 NT at 10-13 Next, the Government turned over an exculpatory surveillance report that proved numerous lapses in the April 26 surveillance operation, as well as numerous instances of unreliable conduct by the informant... after the Defense proved the existence of these lapses and unreliability in its pretrial motions. ECF 219. 220 and 228. Finally, the Government dropped the April 26 "controlled buy" charge because it can't prove that a controlled buy took place, and is now attempting to prevent any information pertaining to its confidential informant from coming to light. *See* ECF 248 and 250.

The positions that the Government is attempting to bring to trial represent a total nullification of the Government's initial position regarding the foundation of its charges generally, and probable cause, specifically. In doing dropping the April 26 controlled buy charge, the Government tacitly admitted that AUSA Lanni's initial arguments in this case were made in violation of his Duty of Candor to this Court. *See* PA Rules of Professional Conduct 3.3(a)(1) and (3). Further, since the Government is only tacitly admitting this conduct rather than actually fessing up to the profound misconduct by agents and AUSA Lanni, it risks continuing violations of its Duty of Candor to this Court.

The Western District of Pennsylvania' Local Rules set out sanctions for misconduct at LCvR 83.3, § (d):

> (d) Sanctions for Misconduct. For misconduct defined in these rules, any attorney admitted to practice before this Court may be disbarred, suspended from practice before this Court, reprimanded or subjected to such other disciplinary action as the circumstances may warrant.

The Defense respectfully submits that, pursuant to LCvR 83.3 § (d), this Honorable Court should sanction the United States Attorney's Office by, at a minimum, precluding the Government from referring to its April 26 surveillance operation as a "controlled buy." This simple, apt remedy would allow this Court to craft "such other disciplinary action as the circumstances may warrant," while also leaving a minimal foot print on the trajectory of this case, while also maintaining the sanctity of words.

## MOTION IN LIMINE TO PRECLUDE THE GOVERNMENT FROM REFERRING TO DRUG EVIDENCE PURPORTEDLY HANDED OVER TO AGENTS BY INFORMANT ON APRIL 26, 2017

**Authentication**

Evidence must be authenticated to be admitted at trial. Fed. R. Evid. 901(A). To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). That said, the "burden of proof for authentication is slight. All that is required is a foundation from which the fact-finder could legitimately infer that the evidence is what the proponent claims it to be." *United States v. Mebratu*, 543 F.App'x 137, 140 (3d Cir. 203) (citation omitted).

Courts have "long rejected the proposition that evidence may only be admitted if a complete and exclusive chain of custody is established[.]" *United States v. Rawlins*, 606 F.3d 73, 82-83 (3d Cir. 2010). Instead, any gaps in the chain of custody generally go "to the weight of the

evidence, not its admissibility. *Id*. regardless, establishing chain of custody is just one of several ways evidence can be authenticated under Fed. R. Evid. 901(a). *Id*. at 82.

Questions of authentication under Rule 901 are treated "as matters of conditional relevance according to the standards of Rule 104(b)," which can be satisfied under the "preponderance of the evidence standard." See *United States v. Brown*, 834 F.3d 403, 433-34 (3d Cir. 2016). The "preponderance of the evidence" standard requires only a showing "that the fact sought to be proved is more probable than not," as opposed to the "clear and convincing evidence" standard which requires that a proponent show that "the truth of its factual contentions is highly probable." See *Araujo v. N.J. Transit Rail Operations, Inc*., 708 F.3d 152, 159 (3d Cir. 2013); *Greenwich Collieries v. Dir. Off. Of Workers' Comp Programs*, 990 F.2d 730, 733 (3d Cir. 1993).

See *United States v. Khorozian*, 333 F.3d 498, 506 (3d Cir. 2003) ("Authentication does not conclusively establish the genuineness of an item it is a foundation that a jury may reject.").

### Authentication of April 26 Drugs

The government is unable to prove by a preponderance of the evidence that the "alleged fentanyl", purportedly obtained by agents from their informant on April 26, came from Defendant – which is probably why agents referred to it as "alleged fentanyl" in their affidavit of probable cause. *See* 5/2/17 Affidavit of Probable Cause at 7, attached hereto as Exhibit D-4. Given the complete failure in reliability of the informant, discussed in depth, *supra*, the government can not probe that it is more probable than not that the drugs came from defendant. The informant is too unreliable, and he had too many opportunities to get those drugs from either the compromised driver, the compromised vehicle, or from the hour that he spent at his own house.

As such, because the Government can not prove that the drugs are more likely to have come from Defendant, instead of their own informant, such drug evidence, or reference to that drug evidence, must be ruled inadmissible. See *United States v. Brown*, 834 F.3d 403, 433-34 (3d Cir. 2016), see also *Araujo v. N.J. Transit Rail Operations, Inc*., 708 F.3d 152, 159 (3d Cir. 2013); *Greenwich Collieries v. Dir. Off. Of Workers' Comp Programs*, 990 F.2d 730, 733 (3d Cir. 1993).

### MOTION TO RECONSIDER DEFENDANT'S MOTION TO SUPPRESS

All preceding paragraphs are included in their entirety as if fully restated herein.

The purpose of a Motion for Reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.,* 602 F.3d 237, 251 (3d Cir. 2010), citing *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir. 1985). Generally, a Motion for Reconsideration will only be granted on one of the following three grounds: (1) if there has been an intervening change in controlling law; (2) if new evidence, which was not previously available, has become available; or (3) if it is necessary to correct a clear error of law or to prevent manifest injustice. See *Howard Hess Dental,* 602 F.3d at 251, citing *Max's Seafood Café by Lou Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999).

Here, the "new evidence" Defendant points to is the Government's tacit admission that it cannot prove an April 26 controlled buy. In addition to the other infirmities Defendant has pointed out, *supra*, this tacit admission sheds a damning light on the misconduct displayed by agents throughout their investigation of Defendant. As discussed below, this is precisely the type of conduct that Courts should seek to deter through exclusion.

The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the placed to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining the sufficiency of an officer's affidavit, a magistrate judge must consider whether the "totality-of-the

circumstances" set forth in the affidavit establish probable cause. See *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). An exact formula for what adds up to probable cause escapes precise and all-encompassing definition. Instead, the Supreme Court has held that probable cause is a "fluid concept" that "turn[s] on the assessment of probabilities in particular factual contexts. *Id*. at 236.

A district judge owes appropriate deference when reviewing a magistrate judge's probable cause determination. *See id*. at 238. There simply needs to be a substantial basis in the affidavit to support the magistrate judge's decision to issue a warrant. *See id*. at 236. And in making the probable cause determination, the magistrate judge may rely on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id*. at 231 (citation and quotation marks omitted). When the defendant challenges the probable cause determination, the defendant bears the burden of showing the magistrate judge lacked a "substantial basis" to issue the warrant. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995) (noting the defendant's burden).

[The Third Circuit] Court of Appeals has long held that "[a] magistrate may issue a warrant relying primarily or in part upon the statement of a confidential informant, so long as the totality of the circumstances gives rise to probable cause." *Stearn*, 597 F.3d at 555. An informant's "veracity" and "reliability" are factors for the magistrate judge to consider when conducting the probable cause inquiry. *Id*. (citing *Gates*, 462 U.S. at 230). In *Gates*, the Supreme Court set aside a rigid analysis of these (2) factors. Instead, the Court held that "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Gates*, 462 U.S. at 233. *Gates* noted independent police corroboration of an informant's tip as a touchstone method for establishing the informant's reliability. *Stearn*, 597 F.3d at 555 (quoting *Gates*, 462 U.S. at 241). When the

alleged offense involves drug trafficking, evidence of past drug trafficking and association with known drug dealers is relevant to the probable cause analysis – though the probative weight is relatively low. *Id*. at 566. But when the officer provides facts that corroborate the confidential source's information, the magistrate judge can rightfully assign greater weight to the confidential source. *Id*.

In assessing the circumstances surrounding the magistrate judge's reliance on information provided by a confidential informant, the Judge Hornack noted that:

> The question is whether, taken together, all of that information amounts to probable cause to support the issuance of a warrant. On the face of the Cell Site Location Information Warrant affidavit, that is a closer call. In particular, the failure to include more detailed information that the Magistrate Judge could properly rely on to conclude that the confidential informant was reliable gives the Court some pause.

*Id*.

## Probable Cause – Good Faith Exception

The exclusionary rule is not a tool to deter mistaken magistrate judges. See *Davis v. United States*, 564, U.S. 229, 238-239 (2011). When a magistrate judge issues a warrant later held invalid, the "error in such a case rests with the issuing magistrate, not the police office." *Id*. Instead, the exclusionary rule applies only when it will appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc) (citing *United States v. Leon*, 468 U.S. 897, 909, 918 (1984)). So, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Put another way, exclusion is not synonymous with finding a violation of the Fourth Amendment. *See Katzin*, 769 F.3d at 170 (citing *Hudson v. Michigan*, 547 U.S. 586, 591-92 (2006).

In *United States v. Leon*, the Supreme Court held that when officers act under a warrant later found to lack probable cause, the exclusionary rule does not apply if the officers acted "in objectively reasonable reliance" on the later-invalidated warrant. 468 U.S. at 922. As our Court of Appeals later observed, "[a] warrant represents judicial authorization of a particular search or seizure, and it is thought that exclusion will not deter police from relying on an invalid warrant unless the police should reasonably have known that the warrant's issuance would be found unconstitutional." *Virgin Islands v. John*, 654 F.3d 412, 418 (3d Cir. 2011).

But the Third Circuit has also identified four exceptions that the Supreme Court carved into *Leon's* holdings. **First, when the magistrate judge issued the warrant relying on a deliberately or recklessly false affidavit**. Second, when the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function. Third, when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonably. Or, fourth, when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. Id. (citing *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010)).

When any of the above four circumstances are present, the officer's reliance on the defective warrant is not objectively reasonable. See *United States v. Franz*, 77s F.3d 134, 145-46, 146 n. 11 (3d Cir. 2014). And in determining whether *Leon's* good faith rule applies, the Court should consider the totality of the circumstances. See *id*. at 147. Thus, the Court should consider "not only any defects in the warrant but also the officer's conduct in obtaining and executing the warrant and what the officer knew or should have known." *Id*. After all, it is the officer's culpability that would drive the suppression of evidence gathered in the execution of a defective warrant. *See id*. at 148-49.

48

Here, agents' deceptive conduct has been exposed, along with their lies and omissions to Magistrate Judge Cynthia Reed Eddy. This Court should exercise the exclusionary rule to deter agents conduct of fully misrepresenting their probable cause to a Magistrate Judge. The Government has tacitly admitted that it cannot prove the April 26 "controlled buy", and therefore, that they cannot prove that they had probable cause for their search warrants. Since the warrants relied on a recklessly or deliberately false affidavit, no good faith exception applies. [T]he exclusionary rule applies only when it will appreciably deter governmental violations of the Fourth Amendment." *United States v. Katzin*, 769 F.3d 163, 170 (3d Cir. 2014) (en banc) (citing *United States v. Leon*, 468 U.S. 897, 909, 918 (1984)). So, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

## MOTION TO RECONSIDER DEFENDANT'S MOTION FOR *FRANKS* HEARING

All preceding paragraphs are included in their entirety as if fully restated herein.

The purpose of a Motion for Reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. <u>Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc., 602 F.3d 237, 251 (3d Cir. 2010),</u> citing <u>Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985).</u> Generally, a Motion for Reconsideration will only be granted on one of the following three grounds: (1) if there has been an intervening change in controlling law; (2) if new evidence, which was not previously available, has become available; or (3) if it is necessary to correct a clear error of law or to prevent manifest injustice. See <u>Howard Hess Dental, 602 F.3d at 251,</u> citing *Max's Seafood Café by <u>Lou Ann, Inc. v. Quinteros,</u> 176 F.3d 669, 677 (3d Cir. 1999).*

Here, the "new evidence" Defendant points to is the Government's tacit admission that it cannot prove an April 26 controlled buy. In addition to the other infirmities Defendant has pointed out, *supra,*

this tacit admission sheds a damning light on the misconduct displayed by agents throughout their investigation of Defendant, particularly in their handling of probable cause.

This Honorable Court has thus far denied Defendant's Motion for a *Franks* hearing. For the reasons set forth in this Memorandum pertaining to the Government's misrepresentations in this case about probable cause, Defendant respectfully submits that a substantial preliminary showing has been established to engender a *Franks* hearing. Simply put, the Government provided that substantial preliminary showing when it dropped the April 26 controlled buy charge, tacitly admitting that it cannot prove the April 26 controlled buy, and therefore, that it cannot prove its probable cause for the search warrants that were used to collect all of the evidence in this case.

As such, Defendant respectfully requests that this Court reopen and reconsider its prior denial of Defendant's request for a *Franks* hearing, based on the Government's tacit admission that it cannot prove the April 26 controlled buy, which provided the probable cause for its search warrants in this case.

This tacit admission provides a substantial preliminary showing that both affirmative misrepresentations and omissions were made in agents' affidavits of probable cause, both in their May 5, 2017 affidavit of probable cause, and their May 10, 2017, Apt 3B/Crafton Blvd affidavit of probable cause, so as to engender a *Franks* hearing.

**Reckless Disregard for the Truth**

In *Franks*, the Court held that where a defendant showed by the preponderance of the evidence that a false statement necessary to the finding of probable cause was made "knowingly and intentionally, or with reckless disregard for the truth," the constitution requires any evidence derived from the exercise of that warrant be excluded from a criminal trial. *Franks v. Delaware*, 438 U.S. 154, at 155, (1978). But as the Court of Appeals for the District of Columbia has

lamented, "[u]nfortunately, the Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that 'negligence or innocent mistake [is] insufficient.'" *United States v. Davis*, 617 F.2d 677, 694 (D.C.Cir.1979) (quoting *Franks*, 438 U.S. at 171, 98 S.Ct. 2674).

Reckless disregard for the truth means different things when dealing with omissions and assertions[.] *Wilson v. Russo*, 212 F.3d 781, at 787 (3d Cir. 2000).  When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit. In contrast, when faced with an omission, the court must remove the falsehood by supplying the omitted information to the original affidavit. (cleaned up) *Id*. at 785 (finding omissions where, for example, affiant gave suspect description and stated that one witness identified the defendant, but did not mention that the defendant was outside the given height range or that another witness had failed to pick the defendant out from a photo array).

**Omissions**

As stated by the Third Circuit Court of Appeals in *Wilson*:

> "… one of the reasons for requiring a neutral magistrate to evaluate probable cause is that an uninterested party is presumably better suited to review and evaluate the facts than an officer pursuing a lead. "the point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 13-14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (cited in *Payton v. New York*, 445 U.S. 573, 586 n. 24, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). It follows that a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence."

*Wilson v. Russo*, 212 F.3d 781, 787. (3rd Cir. 2000). Recognizing the tension between the extreme models – requiring a police officer to tell all, and permitting a police officer to

independently determine materiality – the Third Circuit follows the common sense approach of

the Court of Appeals for the Eight Circuit:

> "omissions are made with reckless disregard if an officer withholds a fact in his ken that "[a]ny reasonable person would have known that this was the kind of thing the judge would wish to know." *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993). In *Jacobs*, the court concluded that the officer acted with reckless disregard when he told the magistrate that a drug sniffing dog showed "interest" in the bag of the defendant but failed to inform the magistrate that it had not gone into "alert." *Id*. at 1234. "Because of the highly relevant nature of the omitted information," the court held that "the omission occurred at least with reckless disregard of its effect upon the affidavit." *Id*.

In applying the above test, the *Wilson* court addressed the pertinent contentions as

follows:

> "Any reasonable person would know that the significant high differential, and the fact that an eyewitness-victim did not identify Wilson, were "the kind of thing[s] the judge would wish to know." *Jacobs*, 986 F.2d at 1235. On the other hand, we do not believe that an officer can be expected to communicate the apparent ethnicity of the victim, or slight variations in appearance on the photographic line-up absent circumstances making these factors more important or prejudicial. Finally, the fact that height and weight were not listed on the photo array is so routine as to be unremarkable to a judge. Although these latter facts could be used for impeachment at trial, a police officer cannot be expected to present a judge with a complete background."

*Wilson*, 212 F.3d at 788.

**Omissions in May 5, 2017 Affidavit**

On May 2, 2017, agents applied for and obtained a search warrant for prospective GPS

location data from the Target Telephone belonging to Defendant. The probable cause within this

affidavit is entirely based on information provided by the informant and the purported controlled

buy. The affidavit[21] makes no mention of the following facts:

     i.     That the reliability of CS1 was already compromised;

---

[21] The May 10 Apt 3B affidavit of probable cause is a copy of the May 2 affidavit, with the added misrepresentation that agents had video and observed Defendant entering and exiting Apt. 3B on April 26.

ii.      That CS1 was driven to the meet location by an unknown individual in an unsecured vehicle;

iii.     That there was no video of the purported transaction;

iv.     That no agents witnessed the purported transaction;

v.      That CS1 told Defendant that the money was for what he owed defendant;

vi.     That, upon exiting Defendant's vehicle and reentering the unknown, unsecured Subaru, CS1 asked to be returned home, then turned the recorder off;

vii.    That more than an hour passed between CS1 turning the recorder off and CS1 meeting with agents to turn over the purported fentanyl.

**Assertions in May 10, 2017 3B Affidavit**

As clarified by the *Wilson* court:

> "Unlike omissions, assertions can be made with reckless disregard for the truth even if they involve minor details – recklessness is measured not by the relevance of information, but the demonstration of willingness to affirmatively distort truth. In applying the reckless disregard test to assertions, we have borrowed from the free speech arena and equated reckless disregard for the truth with a "high degree of awareness of [the statements'] probable falsity." *Lippay v. Christos*, 996 F.2d 1490, 1501 (3d Cir. 1993) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)); see also *United States v. Clapp*, 46 F.3d 795, 800 (8th Cir. 1995) (reckless disregard for the truth is exhibited when expressing that which was not "believed or appropriately accepted" as true). An assertion is made with reckless disregard when "viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Clapp*, 46 F.3d at 801 n. 6.

*Wilson*, 212 F.3d at 788.

As mentioned, *supra*, the May 10 Apt. 3B affidavit asserted, falsely, that Defendant was observed and filmed entering and exiting Apt. 3B before and after the purported "controlled buy" on April 26. *See* 5/10/17 Affidavit of Probable Cause, attached hereto as Exhibit D-11.

**Materiality**

If the Court were to find sufficient evidence that omissions and assertions were made knowingly or with reckless disregard for the truth, the analysis next turns to assessing whether the statements and omissions made with reckless disregard of the truth were "material, or necessary, to the finding of probable cause." *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3rd Cir. 1997).

> "to determine the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the "corrected" warrant affidavit would establish probable cause. See *id*.

*Wilson*, 212 F.3d at 789. The *Wilson* court further clarified:

> "Probable cause exists if there is a fair probability" that the person committed the crime at issue. See *Sherwood*, 113 F.3d at 401. "probable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Orsatti*, 71 F.3d at 483."

*Wilson*, 212 F.3d at 789.

As detailed, supra, the misstatements and omissions in the affidavits of probable cause for the search warrants in this case encapsulated nearly every material fact that probable cause was based on. In their affidavits, Affiant agents:

i.      Intentionally omitted the multiple layers of unreliable conduct by the informant throughout the operation;

ii.     Intentionally omitted the compromised vehicle and driver that transported the informant;

iii.    Intentionally omitted the hour-plus gap between the informant turning the recorder off, being dropped at his residence, and meeting with agents to turn over the drugs;

iv.     Intentionally misrepresented in their May 10 affidavits that they observed and filmed Defendant entering and exiting Apartment 3B before and after the purported controlled buy on April 26, even though agents didn't learn about 3B until May 10.

The Government provided Defendant with his much sought-after substantial preliminary showing when it finally tacitly admitted that it cannot prove the April 26 "controlled buy," and therefore, Defendant respectfully requests that this Honorable Court grant a *Franks* hearing.

## MOTION TO REOPEN AND RECONSIDER DEFENDANT'S MOTION TO COMPEL IDENTITY OF INFORMANT

All preceding paragraphs are included in their entirety as if fully restated herein.

The purpose of a Motion for Reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. *Howard Hess Dental Laboratories Inc. v. Dentsply Intern., Inc.,* 602 F.3d 237, 251 (3d Cir. 2010), citing *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir. 1985). Generally, a Motion for Reconsideration will only be granted on one of the following three grounds: (1) if there has been an intervening change in controlling law; (2) if new evidence, which was not previously available, has become available; or (3) if it is necessary to correct a clear error of law or to prevent manifest injustice. See *Howard Hess Dental,* 602 F.3d at 251, citing *Max's Seafood Café by Lou Ann, Inc. v. Quinteros,* 176 F.3d 669, 677 (3d Cir. 1999).

Here, the "new evidence" Defendant points to is the Government's tacit admission that it cannot prove an April 26 controlled buy. Defendant also points to the Government's about face regarding calling its informant at trial. Defendant prays that this Honorable Court sees through the Government's feigned concern for the safety of the informant. The Government's probable cause is entirely dependent on the reliability of the informant. The informant was the only identifiable person that had contact with the compromised driver. The informant was, ostensibly, the only person that was in his residence. the informant has information that is known by no other witnesses. At least, Defendant respectfully requests that this Honorable Court grant an *in camera* hearing regarding the informant prior to ruling on the instant motion.

Respectfully submitted,

By: */s/ Paul Jubas*

PAUL JUBAS, ESQUIRE
Pa. I.D. No.: 311832
PAUL JUBAS LAW, P.C.
P.O. Box 10704
Pittsburgh, PA 15203
(412) 230-0023
pjubasesq@gmail.com

*Counsel for Defendant*